## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| KEVIN COURTWRIGHT, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.: |
| | ) | |
| CHRISTOPHER B. ROBERTS, | ) | JURY DEMAND |
| PRESIDENT OF AUBURN | ) | |
| UNIVERSITY IN HIS OFFICIAL | ) | |
| AND INDIVUAL CAPACITIES, | ) | |
| AND JIM CARROLL, VICE | ) | |
| PRESIDENT OF FACILITIES | ) | |
| MANAGEMENT, AND LOREN | ) | |
| WINN, FACILITIES HUMAN | ) | |
| RESOURCES DIRECTOR, IN | ) | |
| THEIR INDIVIDUAL CAPACITIES, | ) | |
| | ) | |
| DEFENDANTS. | ) | |

## COMPLAINT

### I.    Introduction

Kevin Courtwright worked as a Landscape Supervisor at Auburn University. His job involved trimming bushes and cutting grass along with small crews of landscape employees. After work, from the comfort of his home, Kevin routinely posted on social media his thoughts about the political and social issues of the moment. On September 10, 2025, Kevin entered the social media frenzy discussing the killing of Charlie Kirk. The leaders at Auburn University did not like what Kevin and other employees had to say. Auburn's president called their comments

insensitive and terminated their employment. Some of Kevin's comments were insensitive, offensive and inflammatory—but that means they were exactly the type of speech the First Amendment protects. Through this lawsuit, Kevin seeks redress for the wrongful termination of his employment in violation of the First Amendment of the United States Constitution, via 42 U.S.C. § 1983.

This is a civil rights action for declaratory judgment, equitable relief and money damages, instituted to secure the protection of and to redress the deprivation of rights secured through the First Amendment of the United States Constitution via 42 U.S.C. § 1983. As set forth below, Plaintiff alleges that Defendants terminated his employment in retaliation against Plaintiff for engaging in speech protected under the First Amendment.

## II. <u>Jurisdiction and Venue</u>

1.    This action arises under the United States Constitution, particularly the First Amendment, and under federal law, particularly 28 U.S.C § 2201 and 42 U.S.C. §§ 1983 and 1988.

2.    This Court is vested with original jurisdiction over these federal claims by operation of 28 U.S.C. §§ 1331 and 1343.

3.    Venue is proper in the Middle District of Alabama, Eastern Division because the injuries complained of herein occurred within the Middle District of Alabama under 28 U.S.C. § 13912(b).

### III.    **Parties**

4.      The Plaintiff, Kevin Courtwright, (hereinafter "Plaintiff" or "Courtwright") is a citizen of the United States, is over the age of (19), is a resident of Alabama, and is a former employee of Auburn University.

5.      Defendant Christopher B. Roberts is the President of Auburn University and is sued in his official and individual capacities. At all times relevant to this action, Roberts acted under color of law. Roberts is a policy maker, and his termination of Plaintiff was an act of official policy.

6.      Defendant Jim Carroll, Vice President of Facilities Management at Auburn University, is being sued only in his individual capacity.

7.      Defendant Loren Winn, Facilities Human Resources Director at Auburn University, is being sued only in her individual capacity.

### IV.    **Facts**

8.      Plaintiff began working for Auburn University on January 31, 2022, as an hourly paid Landscape Supervisor, and he held that same job title throughout his employment.

9.      In this job Plaintiff worked side by side with crews generally consisting of five (5) individuals whom he supervised in the installation, care and maintenance of landscaping at Auburn University. Plaintiff, alongside his crew, cut grass, trimmed

shrubs, applied chemicals and fertilizers, repaired irrigation, planted plants, laid sod, and performed other general landscape manual labor duties.

10.    Plaintiff was the lowest level supervisor in his department, as shown by his chain of command: Plaintiff reported directly to the Landscape Manager, Wesley Miller; Miller reported to the Director of Landscape Services, Justin Sutton; Sutton reported to the Associate Vice President of Facilities Management, Dan Whatley; Whatley reported to the Vice President of Facilities Management, Jim Carroll; Carroll reported to the Chief Financial Officer, Kelli Shomaker; and Shomaker reported to the President of Auburn, Christopher Roberts.

11.    Plaintiff's wife, Kimberly Courtwright, who became a target of Auburn's investigation into Plaintiff's Facebook postings at issue in this case, is also employed at Auburn in the position of Administrative Support Specialist II, Academics, which is the first point of contact in the human resources chain for the School of Fisheries and Aquatic Sciences.

12.    On September 10, 2025, political and social commentator Charlie Kirk was shot and killed while speaking to a group of students on a Utah college campus.

13.    Mr. Kirk was a national public figure, well known for making inflammatory and what many considered to be offensive statements regarding political and social issues that spurred public debate. His death led to a wave of social media

commentary on the left and right side of the political spectrum about his politics, views, and ideas.

14.    Following his death, social media platforms quickly became inundated with comments concerning Mr. Kirk, many of them repeating some of Mr. Kirk's prior statements, such as, "I think it's worth it to have a cost of, unfortunately, some gun deaths every single year so that we can have the second amendment to protect our other God-given Rights. That is a prudent deal. It is rational."[1]

15.    Plaintiff understood this statement to mean that in order to protect the Second Amendment, we have to accept gun violence, and in particular, the ever-increasing deaths of children in mass shootings, which Plaintiff strongly disagreed with, especially given a difficult incident from his own past.

16.    In 2014, a high school student intent on shooting up a high school attended by Plaintiff's son in Missouri was chased by police to a lot adjacent to the college campus where Plaintiff worked as a landscaping foreman. The police cornered the gunman who reacted by shooting himself in the head, splattering brain matter in or beside the university parking lot. When the police finished their work at the scene, Plaintiff's manager instructed Plaintiff to clean up the splattered human remains with a hose, which Plaintiff did, leaving an unshakable horrific impression on him.

---

[1] https://www.theguardian.com/us-news/2025/sep/11/charlie-kirk-quotes-beliefs

17.    Mr. Kirk has also made statements about gay and trans people which Plaintiff found offensive. Plaintiff, an ordained minister, strongly disagreed with Mr. Kirk's statement that stoning gay people to death was "God's perfect law when it comes to sexual matters,"[2] as well as with Mr. Kirk's statement that, "We need to have a Nuremberg-style trial for every gender-affirming clinic doctor. We need it immediately."[3]

18.    Plaintiff holds a strong belief that African Americans and women should have an equal right to advance in society, and he disagreed with Kirk's comments about African Americans and women, such as:

- "If I see a Black pilot, I'm going to be like, boy, I hope he's qualified."[4]

- "Happening all the time in urban America, prowling Blacks go around for fun to go target white people, that's a fact. It's happening more and more."[5]

- "If I'm dealing with somebody in customer service who's a moronic Black woman, I wonder is she there because of her excellence, or is she there because of affirmative action?"[6]

[2] https://www.yahoo.com/news/articles/charlie-kirk-did-stoning-gay-120003332.html
[3] https://www.theguardian.com/us-news/2025/sep/11/charlie-kirk-quotes-beliefs
[4] https://www.theguardian.com/us-news/2025/sep/11/charlie-kirk-quotes-beliefs
[5] https://www.theguardian.com/us-news/2025/sep/11/charlie-kirk-quotes-beliefs
[6] https://www.theguardian.com/us-news/2025/sep/11/charlie-kirk-quotes-beliefs

- "Reject feminism. Submit to your husband, Taylor. You're not in charge," when discussing Taylor Swift and Travis Kelce's engagement.[7]

- "You do not have the brain processing power to otherwise be taken really seriously. You had to go steal a white person's slot to go be taken somewhat seriously,"[8] when discussing black women in leadership and addressing Michelle Obama, Supreme Court Justice Ketanji Brown Jackson, and other black women.

19.    Plaintiff often uses Facebook to express his views on religion, politics, and social issues, spurring debate and opening his own mind to understanding opposing viewpoints, which in the past has sometimes led Plaintiff to change his own mind, modify his views, or better comprehend the social and political issues of the moment.

20.    After work on September 10, 2025, when Plaintiff got home around 6:00 p.m., Plaintiff joined the raging commentary on the death of Charlie Kirk, a matter of public concern, and reposted the following on his Facebook page, which addressed what he knew to be a matter of public concern:

> So, Charlie Kirk was shot and killed at one of his events. The man who said that school shootings were just something worth living with in order to keep the 2nd amendment, who leaned into every single culture war issue to push hate and division, and who was making absurd claims about trans people being mass shooters at the time he was [Redacted], is likely going to be used

---

[7] https://www.theguardian.com/us-news/2025/sep/11/charlie-kirk-quotes-beliefs
[8] https://www.theguardian.com/us-news/2025/sep/11/charlie-kirk-quotes-beliefs

for some justification to crack down on something by this regime…but hell, no matter what, they were going to find a reason. Tots and Pears. I doubt Kirk even believed half the shit he was peddling, but there was money to be made and influence to be wielded so he ran with it anyway. These are about the nicest things I can say about this situation at this time.

21.    Plaintiff also added his own commentary on this matter of public concern to the above post when reposting it on his Facebook page: "One fascist down; a whole socio-political movement go. FAFO nazi trash." This statement meant that Mr. Kirk had made statements about accepting gun violence, and he unfortunately experienced the consequences of gun violence.

22.    Plaintiff used the terms "fascist" and "nazi" to describe certain aspects of the political movement started by Charlie Kirk. Based on what Plaintiff had read and heard from Mr. Kirk, Plaintiff considered Mr. Kirk's socio-political views potentially dangerous and in line with a far-right authoritarian and ultranationalist political ideology, which in the early 20th century led to the rise of the nazi party in Germany. Plaintiff used social media to express his opinion and spur debate of Mr. Kirk's politics, and by putting his opinion out there, Plaintiff hoped to exchange his views with others and learn from the opposing views that others would post.

23.    That same day Plaintiff reposted other posts, including the following which showed Plaintiff's stance against gun violence, the horrific killing of Charlie Kirk, and that he did not condone his murder: "No one should be shot, Charlie Kirk included. But let's be real: Republican leaders crying crocodile tears about gun

violence while BLOCKING every piece of gun reform are the reason it keeps happening. DOING NOTHING is the choice THEY have made." "THAT HORRIFIC FOOTAGE IS THE SAME THING THAT HAPPENS TO CHILDREN AT SCHOOL, BY THE WAY." "CHARLIE KIRK IS NO MORE IMPORTANT THAN THE HUNDREDS OF SCHOOL AGE CHILDREN SHOT AND KILLED AT SCHOOL. GUNS ARE THE PROBLEM." "I'm not celebrating the loss of Charlie Kirk's life. Violence is not the answer. I am celebrating the loss of his message of violence, in an increasingly violent world, which is partially because of him." "At least two students were shot today at Evergreen High School near Denver, Colorado. Charlie Kirk was shot today at Utah Valley University. ONLY ONE of these stories has made national headlines. NO ONE is immune from gun violence. There have been at least 98 shootings at schools this year, and it's only September."

24.    Plaintiff returned to work the next day and continued his grounds maintenance duties at the university without incident, and Plaintiff kept his political opinions about Charlie Kirk and his disagreement with Mr. Kirk's political movement to himself at work.

25.    On September 15, 2025, two men from Compliance and Security, Chris Hardman, Coordinator Behavioral Threat Assessment and Management, and Scott Forehand, Director of Compliance Investigations and Security, approached

Plaintiff's wife, Kim Courtwright, and questioned her about her husband. Mrs. Courtwright assured the men that her husband was not a threat to anyone.

26.    The men told Mrs. Courtwright that a student had filed a concern about her husband's Facebook post and said they questioned Mrs. Courtwright about what her husband would do if he came upon a tabling event for Turning Point USA. Plaintiff told the men her husband would do nothing.  Mrs. Courtwright assured the men that there was nothing to be concerned about with Plaintiff because he was a good man.

27.    The men asked Mrs. Courtwright if her husband's behavior had recently changed and she said it had not, and Mrs. Courtwright explained that she and her husband believed that all people should be respected and that Charlie Kirk was an example of someone whom she believed did not treat everyone like the true forgiving Christian she and her husband strived to be.

28.    Mrs. Courtwright told the men that Mr. Kirk disrespected African Americans such as Michelle Obama, and LGBTQ people whom he wanted to stone.

29.    Mrs. Courtwright reiterated that her husband's post was not a threat, and there was no need to worry or have any concerns about her husband.

30.    Mrs. Courtwright assured the men that her husband would never hurt anyone, and they had clearly misunderstood his Facebook post.

31.    Minutes after the men approached Plaintiff's wife, Plaintiff was summoned to the Facilities Human Resources office to talk with Clarence Stewart from Auburn

Security and Compliance. In that meeting, Stewart told Plaintiff that there had been a complaint about the Facebook post Plaintiff had made, and he questioned Plaintiff on whether he had any violent intent with his post. Plaintiff assured them he did not.

32.    The next day, September 16, 2025, Plaintiff went to meet with the Director of Facilities Human Resources, Loren Winn, and explained to her that there was a misunderstanding about the intent of his Facebook post. Plaintiff asked Winn if he was going to be fired.

33.    HR Director Winn told Plaintiff that Auburn tends not to move drastically, and she was inclined to think he would not be fired, but there was a chance.

34.    Minutes after Plaintiff met with Winn, Stewart telephoned Plaintiff and told him that he should take down his Facebook posting about Charlie Kirk for damage control and lock down his Facebook so others could not view it. Plaintiff did as Stewart instructed.

35.    On September 17, 2025, Director of Landscaping Services Sutton took Plaintiff to the same conference room he had been in on the 15th, where Security and Compliance Officer Stewart, HR Director Winn, and VP of Facilities Management Jim Carroll were waiting.

36.    The group told Plaintiff he had violated University Code 8.3.3 which is a Group 1 offense, placed him on administrative leave, and then allowed him to speak.

37.    Plaintiff told the group about his political beliefs and disagreement with the rhetoric of Charlie Kirk and his political movement, and Plaintiff reiterated that he was not a threat to anyone. The group required Plaintiff to turn over his keys and his phone, which belonged to the university.

38.    On September 17, 2025, Auburn's President, Christopher B. Roberts, showed his direct involvement in the decision to terminate Plaintiff and other employees who made social media posts about Charlie Kirk that he found "insensitive," stating as follows:

> It has come to our attention that there are Auburn employees who made social media posts that were hurtful, insensitive and completely at odds with Auburn's values of respect, integrity and responsibility in violation of our Code of Conduct. We are terminating the employment of those individuals. We unequivocally condemn this conduct, which is antithetical to the values we hold dear in the Auburn Creed.

39.    On September 22, 2025, Carroll called Plaintiff and told him he was terminated.

40.    The next day, September 23, 2022, Plaintiff received a certified letter stating he was terminated for violating Auburn University Employee Relations Policy 8.3.3, which includes:

- Intimidating or intentionally imposing on the rights and privileges of other employees;

- Engaging in grossly offensive, obscene, or immoral conduct;

- Any actions deemed by the University as constituting major misconduct.

41.    The letter went on to state as follows:

> After a thorough review of all relevant information, it has been determined that your actions are in direct violation of Auburn University's Personnel Policies and Procedures (Group I offenses). Group I violations include conduct regarded as major misconduct, behavior that is grossly offensive or immoral, and a gross disregard of obligations to the University.

42.    Plaintiff's post did not violate the above rules, and Plaintiff did not engage in any conduct or speech in violation of those rules. However ill-considered Defendant perceived Plaintiff's comments to be, his comments did not render him unfit for his job as a Landscape Supervisor. Plaintiff's Facebook posts were protected speech under the First Amendment to the United States Constitution.

43.    Defendant Roberts later attempted to retract his statement quoted above; as reported in the Auburn Plainsman, the student newspaper, Roberts "stated that he regretted some elements of his statement, which caused confusion over 'offensive speech vs threatening speech.'"

44.    However, Plaintiff's speech was not threatening.

45.    If a university student had truly complained about Plaintiff's Facebook posts, Plaintiff had no position of control or undue influence over that student's education; rather, Plaintiff simply tended to the beautification of the campus by cutting the shrubs and the grass. Plaintiff had no duties at the university affecting the education of students.

46.     In terminating Plaintiff for engaging in protected speech on matters of public concern, including political speech, Defendants acted with malice and/or with reckless indifference to Plaintiff's federally protected rights under the First Amendment to the United States Constitution.

47.     Plaintiff has no plain, adequate or complete remedy at law to redress the wrongs alleged herein and this suit for backpay, declaratory judgment, injunctive relief, and compensatory and punitive damages is his only means of securing adequate relief.

48.     Plaintiff is now suffering and will continue to suffer irreparable injury from Defendants' unlawful conduct as set forth herein unless enjoined by this Court.

49.     As a result of Defendants' actions, Plaintiff has suffered damages, including the termination of his employment and all benefits associated with his employment, lost wages, lost opportunities for future employment, severe emotional distress and fear for his life.

## V.    __Causes of Action__

### A.    __COUNT I - WRONGFUL DISCHARGE IN VIOLATION OF THE FIRST AMENDMENT VIA 42 U.S.C SECTION 1983.__

50.    This count is brought against all Defendants.

51.    Defendants acted under color of law by virtue of their positions.

52.    Defendants terminated Plaintiff based on the content of his speech.

53.    The First Amendment prohibits government officials from discharging an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech.

54.    Plaintiff engaged in constitutionally protected speech when he published statements on matters of public concern, including comments about Charlie Kirk, the socio-political movement started by Charlie Kirk, and Plaintiff's opposition to comments made by Charlie Kirk.

55.    Plaintiff also engaged in constitutionally protected speech when he publicly reposted the opinion of others and publicly posted his own thoughts about Charlie Kirk and the movement he spearheaded.

56.    In 1987, the United States Supreme Court held in *Rankin v. McPherson* that "[i]t is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." 483 U.S. 378, 383 (1987). The employee in *Rankin*, a deputy constable, made a comment concerning the attempted assassination of President Reagan, stating, "if they go for him again, I hope they get him." *Id.* at 380.

57.    In finding that this statement constituted "speech on a matter of public concern," the Supreme Court held that "[t]he inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Id.* at 387.

58.    The Supreme Court held that "[g]iven the function of the agency, McPherson's position in the office, and the nature of her statement, we are not persuaded that Rankin's interest in discharging her outweighed her rights under the First Amendment." *Rankin v. McPherson*, 483 U.S. 378, 392 (1987).

59.    Similarly here, the fact that Plaintiff's speech in this case is considered by some to be inappropriate or offensive does not place it outside the protection of the First Amendment.

60.    Rather, Plaintiff's speech in this case is "core political speech,' with respect to which 'First Amendment protection is 'at its zenith.'" *Speech First, Inc. v. Cartwright*, 32 F. 4th 1110, 1125 (11th Cir. 2022).

61.    Given the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, public universities such as Auburn occupy a special place protecting free speech, and the comments Plaintiff made about a public figure should be freely debated and examined in the university setting without fear of retaliation.

> A university that has placed its highest premium on the protection of feelings or safe intellectual space has abandoned its core mission. The protection of feelings or the creation of safe space rightly might be the foremost goal in some settings, like at a family dinner, but it is not right for a university. Its unambiguous mission must remain the pursuit of truth. […] A university that turns itself into an asylum from controversy has ceased to be a university; it has just become an asylum.

*Id.* at 1130.

62.    Plaintiff has a private interest in exercising his First Amendment rights to make statements about public figures such as Charlie Kirk and the political movement he started.

63.    Plaintiff spoke as a private citizen on a matter of public concern rather than as a public employee.  Plaintiff did not make this speech pursuant to his official duties; rather, he spoke as a private citizen on matters of public concern.

64.    Plaintiff engaged in protected speech from the privacy of his own home, and his speech did not impede the performance of Plaintiff's duties or interfere with the regular operation of the university.

65.    Plaintiff is not a policymaking employee and as such his private political beliefs do not interfere with the discharge of his public duties.

66.    Defendants violated the First Amendment when they discharged him on a basis that infringed his constitutionally protected interest in freedom of speech.

67.    Plaintiff's termination was an act of official policy by the president of Auburn University, who is the policymaker for the university.

68.    Defendants' decision to terminate Plaintiff's employment constitutes actions likely to chill the exercise of constitutionally protected speech or deter a person of ordinary firmness from the exercise of First Amendment rights.

69.    There is a causal connection between Plaintiff's engagement in protected activity and Defendants' retaliatory actions against Plaintiff up to and including the termination of his employment.

70.    To the extent that Defendants' articulated reasons for terminating Plaintiff do not directly implicate Plaintiff's constitutionally protected speech, those reasons for firing Plaintiff are false and a pretext for terminating Plaintiff for exercising his constitutional right to freedom of expression.

71.    In the alternative, any reasons articulated by Defendant for terminating Plaintiff's employment involving the effect of Plaintiff's speech on others do not outweigh Plaintiff's constitutionally protected interest in freedom of speech.

72.    Plaintiff's interest as a citizen in commenting upon matters of public concern about a public figure and the movement he represents far outweighed any interest the university has in promoting the efficiency of the public services it performs through its employees.

73.    Plaintiff's speech through the posts on Facebook sought to advance debate of political, social, and other ideas of interest to the community as a whole. All of Plaintiff's speech can fairly be considered as relating to any matter of political, social, or other concern to the community.

74.     But for Plaintiff's engagement in protected activity, Defendants would not have taken adverse employment actions against him up to and including terminating his employment.

75.     Defendants intentionally retaliated against Plaintiff for his engagement in protected activity by taking adverse employment actions against him up to and including terminating his employment.

76.     As a result of unlawful retaliation, Plaintiff has suffered damages, including but not limited to severe emotional distress, embarrassment and humiliation, lost employment opportunities, termination of his employment and benefits, and lost wages.

77.     Plaintiff seeks punitive damages against the individually named Defendants for their malicious conduct.

## VI.    **Damages**

78.     Plaintiff is now suffering, and will continue to suffer, irreparable injury from Defendants' unlawful conduct as set forth herein unless enjoined by this Court.

79.     Plaintiff has extreme emotional distress, severe emotional and physical pain and anguish, embarrassment, humiliation, shame, damage to reputation, damage to his personal and family relationships, termination of his employment, loss of benefits, loss of retirement, loss of income, legal fees, medical expenses, lost earning

potential, and other pecuniary losses as a consequence of Defendants' unlawful conduct.

80.    Plaintiff has no plain, adequate or complete remedy at law to redress the wrongs alleged herein and this suit for declaratory judgment, injunctive relief, compensatory, and punitive damages is his only means of securing adequate relief.

## VII.  <u>Request for Relief</u>

WHEREFORE, Plaintiff seeks the following relief:

1.    Award a judgment in favor of Plaintiff against Defendants in an amount in excess of the jurisdictional limits of this court for compensatory damages, including damages for severe emotional and physical pain and anguish, embarrassment, humiliation, shame, damage to reputation, damage to his personal and family relationships, loss of income, legal fees, medical expenses, lost earning potential, future rehabilitation expenses, future medical costs, future counseling, and other pecuniary losses as a consequence of Defendants' unlawful conduct.

2.    Award punitive damages against the Defendants sufficient to punish them and to deter further wrongdoing;

3.    Award Plaintiff reinstatement into the position he would have absent the retaliation or front pay if reinstatement is not safe for Plaintiff or otherwise not possible;

4.      Grant injunctive relief sufficient to protect Plaintiff from harassment and intimidation of Defendants;

5.      Award Plaintiff reasonable attorney fees pursuant to 42 U.S.C. 1988, including a reasonable attorneys' fee for work preliminary to and necessary to the institution of this action;

6.      Award Plaintiff all litigation expenses, costs, prejudgment and post judgment interest as provided by law; and,

7.      Such other and further relief as the Court deems just and proper.

### THE PLAINTIFF DEMANDS A TRIAL BY JURY
### ON ALL ISSUES SO TRIABLE

Respectfully submitted,

*/s/ Jon C. Goldfarb*
Jon C. Goldfarb asb-5401-f58j
L. William Smith asb-8660-a61s
Christina M. Malmat asb-1214-y44q
Counsel for Plaintiff

**OF COUNSEL**:
Wiggins, Childs, Pantazis, Fisher,
& Goldfarb, LLC
301 19th Street North
Birmingham, AL 35203
Telephone No.: (205) 314-0500
Facsimile No.: (205) 254-1500